Mrs. F. E. MURPHY, Plaintiff,

v.

Tillie C. SMITH and Thomas W. Smith, Defendants.

Billy MURPHY, by his Guardian ad Litem, Mrs. F. E. Murphy, Plaintiff,

v.

Tillie C. SMITH and Thomas W. Smith, Defendants.

David MURPHY, by his Guardian ad Litem, Mrs. F. E. Murphy, Plaintiff,

v.

Tillie C. SMITH and Thomas W. Smith, Defendants.

Linda MURPHY, by her Guardian ad Litem, Mrs. F. E. Murphy, Plaintiff,

v.

Tillie C. SMITH and Thomas W. Smith, Defendants.

Roy E. HICE, Plaintiff,

v.

Tillie C. SMITH and Thomas W. Smith, Defendants.

Frison E. MURPHY, Plaintiff,

and

United States of America, Intervener,

v.

Tillie C. SMITH and Thomas W. Smith, Defendants.

Civ. A. Nos. AC–1148–AC1153.

United States District Court
E. D. South Carolina,
Columbia Division.

July 23, 1965.

Isadore E. Lourie, Henry Hammer, Columbia, S. C., for plaintiffs.

Robinson, McFadden & Moore, with J. Means McFadden, Columbia, S. C., for defendants.

Wistar Stuckey, Asst. U. S. Atty., Columbia, S. C., for intervener, United States.

SIMONS, District Judge.

The within captioned tort actions consolidated for trial were brought by plaintiffs to recover damages allegedly sustained by them in a collision that occurred on or about March 16, 1963, on the Fort Jackson Military Reservation between a 1957 Chevrolet automobile owned and operated by plaintiff Frison E. Murphy, in which other plaintiffs were riding as guest passengers, and a 1962 Chevrolet convertible automobile owned by defendant Thomas W. Smith and being operated upon said occasion by his daughter, Tillie C. Smith, with his per-

mission. Jurisdiction is invoked under Title 28, U.S.C.A. Section 1332 [a] [1], based upon diversity of citizenship of the parties and the amounts in controversy.

In the Frison E. Murphy case, Civil Action No. AC–1153, United States of America was permitted to intervene as a party-plaintiff, pursuant to Title 42 U.S.C. § 2651 and Rule 24 of the Federal Rules of Civil Procedure, by virtue of an assignment by said individual plaintiff to the intervener of his rights against the defendants for hospital, doctors' and other medical expenses provided by the United States Army as a result of the injuries received by him in said collision.

These cases were tried by the court without a jury during the week of March 10, 1965, in Columbia, South Carolina. Thereafter, counsel for parties submitted able briefs and written arguments supporting their positions and contentions. The issues raised by the evidence to be determined by the court are as follows: 1] Was defendant Tillie C. Smith, driver of the 1962 Chevrolet automobile, guilty of actionable negligence which proximately caused or contributed to the collision in question; if so, was such negligence imputed and chargeable to defendant Thomas W. Smith, her father and owner of the automobile, under the family purpose doctrine? 2] Was plaintiff Frison E. Murphy, the owner and operator of the 1957 Chevrolet automobile upon said occasion, guilty of contributory negligence, which contributed as a proximate cause to said collision so as to bar his recovery in his action; and if so, was the same imputed to the other plaintiffs, the passengers in his said automobile? 3] What actual damages, if any, are plaintiffs entitled to recover? 4] Was defendant Tillie C. Smith guilty of recklessness, wilfulness and wantonness, so as to entitle plaintiffs to recover punitive damages; and if so, in what amounts?

In accordance with Rule 52 [a] of the Federal Rules of Civil Procedure I find the facts specially and state my conclusions of law thereon in said cases as follows:

## FINDINGS OF FACT

On March 16, 1963, at approximately 1:00 p. m., plaintiff Frison E. Murphy was operating his 1957 Chevrolet automobile in an easterly direction along Semmes Road, approaching its intersection at right angles with Lee Road, on the Fort Jackson Military Reservation. The other five plaintiffs were riding as guest passengers in said automobile; Mrs. Murphy and Linda Murphy were occupying the front seat with plaintiff Frison E. Murphy; and David Murphy, Billy Murphy, and Roy E. Hice were riding in the rear seat.

On said occasion defendant Tillie C. Smith was operating the 1962 Chevrolet automobile owned by her father, the defendant Thomas W. Smith, with his express consent and as his agent under the family purpose doctrine, in a southerly direction along Lee Road approaching its intersection with said Semmes Road. Riding as passengers in the Smith automobile were Miss Mary Margaret Benbow, Sandra Smith [Fowler], sister of defendant Tillie C. Smith, and Carl Joe Fowler, Jr., now the husband of Sandra Smith Fowler.

It is admitted that defendant Tillie C. Smith was driving the automobile of her father and co-defendant, with his permission and consent; and under the family purpose doctrine the negligence, recklessness, wilfulness and wantonness of the automobile on said occasion, if any, of said Tillie C. Smith was imputed to the defendant Thomas W. Smith.

Both Semmes and Lee Roads are approximately 22 feet in width, and vehicles traveling in the directions that the parties herein were proceeding just prior to the accident are visable to the drivers of said vehicles proceeding along the intersecting roads for approximately 500 feet from and continuing on to the intersection. The posted speed limit for Lee Road in this area is 35 m. p. h., and that of Semmes Road is 30 m. p. h. At the time of subject collision a stop sign was

located on the western side of Lee Road north of Semmes Road approximately 49 feet from the intersection, and was visible for approximately 500 feet from the intersection to motorists traveling in a southerly direction along Lee Road approaching said intersection, which required all vehicles traveling in such southerly direction along said Lee Road [the direction in which defendant Tillie C. Smith was driving said automobile] to stop before entering and crossing said intersection with Semmes Road.

As both vehicles approached the intersection, they were being driven at a reasonable and lawful rate of speed, the Murphy automobile traveling at about 25 m. p. h. and the Smith automobile being driven approximately 30 m. p. h. Having been stationed at Fort Jackson for some time, plaintiff Frison E. Murphy was quite familiar with the general area, the roads and the intersection. While approaching the intersection he saw the Smith automobile traveling along Lee Road to his left. Knowing that the stop sign required traffic moving in a southerly direction along Lee Road to stop he was justified in assuming that the Smith automobile would stop in obedience thereto. Both vehicles approached and reached the intersection at approximately the same time, while traveling at about the same speed. The Murphy car apparently entered the intersection a

moment prior to the Smith automobile; and upon suddenly realizing that the Smith car had passed the stop sign without slowing and was not stopping in obedience thereto, Murphy applied his brakes and skidded his tires for a distance of 11 feet before striking the right side of the Smith automobile with the front end of his automobile.

 As defendant Tillie C. Smith approached said intersection she did not see the Murphy automobile approaching to her right along Semmes Road; she also failed to see the stop sign commanding her to stop at said intersection, although the automobile and the stop sign were cleary within her view for a distance of several hundred feet had she been keeping a proper lookout. Although she was driving at a reasonable and lawful rate of speed, she did not maintain the proper lookout required by due care, failed to see and heed the stop sign, and refused to yield the right-of-way to the Murphy automobile, as required by the common law rules of the road and the statutory laws of the State of South Carolina. Her delicts violated Sections 46–421 [1] and 46–423 [2] of the 1962 South Carolina Code of Laws, and were therefore acts of negligence *per se*. The foregoing negligence of the defendant, Tillie C. Smith, for which the defendant, Thomas W. Smith is also legally responsible, constituted the proximate cause of

---

1. "§ 46–421. Vehicles approaching or entering intersection.—The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection from a different highway. When two vehicles enter an intersection from different highways at approximately the same time, the driver of the vehicle on the left shall yield the right of way to the vehicle on the right.
"The right-of-way rules declared in this section are modified at through highways and otherwise as stated in this article."

2. "§ 46–423. Vehicle entering through highway or stop intersection.—The driver of a vehicle shall stop as required by this chapter at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the

intersection from the through highway or which are approaching so closely on such through highway as to constitute an immediate hazard, but such driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection on such through highway shall yield the right of way to the vehicle so proceeding into or across the through highway.
"The driver of a vehicle shall likewise stop in obedience to a stop sign as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway and shall proceed cautiously, yielding to vehicles not so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed."

the collision, resulting in the damages and injuries suffered by plaintiffs. Under my view of the evidence, Miss Smith was not guilty of gross negligence, recklessness, wilfulness or wantonness under the facts and circumstances here, so as to warrant or justify an award of punitive damages. There was no excessive speed on her part, she was completely unfamiliar with the area and the intersection; thus I do not find sufficient exaggerated circumstances to support a determination that she was reckless, wilful or wanton in the operation of the automobile on that occasion.

Counsel for defendants strongly urges that plaintiff Frison E. Murphy was guilty of contributory negligence, which proximately contributed to and concurred in bringing about the collision; that he was thoroughly familiar with the intersection, saw the Smith car fail to slow down or stop at the stop sign 49 feet back from the intersection as it approached from the north; and that he failed to use due care for his own safety and to prevent injury to others by not slowing, stopping or turning his automobile after he realized the Smith automobile was not going to stop in obedience to the stop sign on Lee Road, citing numerous cases to support his contentions.[3]

■ I am unable to agree that plaintiff Frison E. Murphy failed to use reasonable care or was guilty of contributory negligence under the facts as I see them. Although he was familiar with the intersection and saw the Smith automobile approaching at a reasonable rate of speed, he was justified in assuming that it would stop at the stop sign, as required by South Carolina law. Both automobiles approached the intersection at about the same time and speed, and after plaintiff Murphy first realized that the Smith car was not going to stop, he then did not have ample time to stop or turn his automobile so as to avoid the collision. Thrust into an emergency situation through no fault on his part, he immediately applied his brakes, sliding his wheels for 11 feet in an attempt to avoid the collision. Did he not act as any person of ordinary reason and prudence under the circumstances? During the trial and in his written argument defense counsel conceded that there was no evidence of a joint enterprise among the occupants of the Murphy car, and thus if Murphy had been guilty of contributory negligence, the same would not have been imputed to his guest passengers. Defendants are liable to plaintiffs for actual damages.

### AS TO PLAINTIFF FRISON E. MURPHY:

Plaintiff Frison E. Murphy was 48 years of age at the time of the collision; his life expectancy, according to the Mortuary Table, § 26–12, as amended, of the 1962 South Carolina Code of Laws, was 25.27 years as of that date. He was then on active duty in the United States Army at Fort Jackson assigned to duties as a cook, earning $470 a month. His work required constant standing on his feet, involved heavy lifting, stooping and bending. Although the expert medical testimony [Dr. David Holler, orthopedic surgeon for plaintiff, and Dr. James T. Green, orthopedic surgeon for defendant] was in such sharp conflict that the court is totally unable to reconcile it and has experienced genuine difficulty in arriving at a just determination of the injuries suffered by this plaintiff, it is unquestioned that Mr. Murphy did suffer and sustain serious, painful, disabling permanent injuries which were diagnosed by his Army physician, Dr. Marvin L. Shelton, an orthopedic surgeon at Fort Jackson who initially attended him in the hospital there, as "fracture, comminuted, simple, middle third, right femur; concussion of brain; contusion left chest and right knee; abrasion, right knee and dorsum of hand,

---

3. North State Lumber Company v. Charleston Consolidated and Lighting Company, 115 S.C. 267, 105 S.E. 406; Gillespie v. Ford, et al., 222 S.C. 46, 71 S.E.2d 596; Williams v. Kalutz, 237 S.C. 398, 117 S.E.2d 591; and Copley v. Stone, 75 F.Supp. 203 [W.D.S.C.].

left hand; thrombophlebitis right leg". He was hospitalized at the Fort Jackson Hospital on March 16, 1963, and discharged September 3, 1963, being away from the hospital on convalescent leave for 30 days from June 21 to July 21, 1963.

While confined in the hospital a wire was placed through his tibia below the right knee, fifteen pounds of weight were attached to the wire; he remained in traction for 10 days thereafter, and was required to lay flat on his back with his leg elevated. Upon the removal of the wire he underwent an operation for the fracture of the right femur which involved the insertion of an intermedullary rod in the hollow portion of the femur through the hip, extending down to the distal end of the femur. A plate on the outside of the bone fracture was attached to this rod with screws. The operation also required a grafting of bone taken from the left side of the pelvis which was placed about the fracture site to promote healing. While in the hospital he developed a blood clot, or thrombophlebitis, in his lower right leg above the ankle.

Upon his discharge from the hospital on September 3, 1963, he had to learn to walk again by the use of bars, and then thereafter used crutches for a considerable period of time. He attempted to go back to cooking on limited duty the latter part of September 1963, but found that he was unable to perform his work properly because he could not lift heavy objects, stand on his feet for an extended period of time, and suffered considerable pain. He thereafter retired from the Army during January 1964, and has since drawn $190 per month retirement from the Army. His injuries were considered received in the line of duty, so he was paid his full salary by the Army during his hospitalization and limited service thereafter until his retirement.

Plaintiff testified that subsequent to his retirement he had tried repeatedly to find a job cooking, but was unable to obtain regular employment because of his inability to stand for long periods; and his physical disability resulting from the accident; that he had only received a fourth grade education, the only work for which he was trained or experienced was that of a cook; and that he was physically unable to hold down this type of job any longer because of his injuries; he testified that his leg still hurt, that he had a dead feeling in his lower leg, and that his knee swells if he stands for any substantial period of time.

Dr. David Holler, orthopedic surgeon of Columbia, who testified for plaintiff, first saw him on December 3, 1963, many months after the accident; he found that plaintiff had a marked limp, scarring of his leg, a smaller thigh on the right than on the left resulting from the loss of muscle substance; he also found some lateral motion on inside of plaintiff's right knee which caused some instability; his knee did not function normally, having developed some osteoarthritis. Dr. Holler examined plaintiff again on February 5, and March 8, 1965, just prior to the trial. X-rays taken during these examinations revealed that plaintiff was suffering from severe osteoarthritis of the right knee, which probably resulted from his injury; he also had a crepitation [noise] in his right knee. The doctor also noted changes in the texture, skin color and pigmentation of his lower right leg, all of which were consistent with thrombophlebitis. The intermedullary rod with metal plate and screws were still in the right femur. He strongly recommended that this hardware should be removed, which would require a 1 to 2 week hospitalization with an estimated total of doctor and hospital bills of $600 to $800. Dr. Höller further testified that plaintiff's injuries were permanent, that he was unable to perform all the heavy duties of a commercial cook; that he was unable to stoop, lift heavy objects, stand for long periods, or do other activities required of a cook. In substance Dr. Holler's testimony was to the effect that plaintiff was permanently disabled from perform-

ing the regular required duties of a commercial cook.

Dr. James T. Green, orthopedic surgeon of Columbia, who examined plaintiff Murphy on only one occasion, February 4, 1965 at the instance of the defendants, testified that plaintiff had a 10 degree limitation of flexion of the right knee and some crepitation in that knee; he found the right ankle somewhat larger than the left, and there was an area of reduced sensation to feeling in the lower right leg; he concluded that plaintiff had made a good recovery, his right thigh was the same size as the left, and in his opinion no further treatment was indicated. He further testified that with continued use plaintiff should be able to increase his physical activity; in his judgment there was no reason why the hardware should be removed from plaintiff's right leg, that he had good motion and circulation in his leg and does not have enough trouble with his leg, knee and ankle to prevent him from doing a good day's work. In substance Dr. Green found plaintiff physically able to do all types of work with the exception of the very heaviest types, such as "pushing heavily loaded wheelbarrows".

From my evaluation of the evidence as to the injuries suffered by plaintiff, there is no question that plaintiff suffered severe, painful, and permanent injuries, which caused him to suffer excruciating pain and mental anguish; required that he be hospitalized and under the care of doctors and nurses for an extended period of time. He was totally disabled for 7 months, and has been partially disabled since that time. Undoubtedly he has suffered substantial permanent impairment in the use of his right leg, and will continue to suffer some pain and discomfort in this area; his earning capacity has been permanently impaired and he will, in all probability, never be physically able to again be employed on a full time basis as a commercial cook, the only job for which he has been specially trained. I further find, however, that plaintiff is now, and will continue to be, physically able to perform non-technical and semi-skilled activities from which he should be able to supplement his retirement income so as to earn a comfortable living for himself and his family.

Plaintiff's automobile was damaged in the collision to the extent that it required the expenditure of $425 to have the same repaired. He has also incurred some medical and doctors' bills other than those for which the United States is entitled to be reimbursed; he will incur additional medical expenses in the future in the removal of the hardware from his thigh; also his injuries make him more prone to develop osteoarthritis and thrombophlebitis in the injured areas.

■ I find and conclude that plaintiff has suffered actual damages in the amount of $23,425.00.

### AS TO PLAINTIFF MRS. F. E. MURPHY:

■ Mrs. F. E. [Marie] Murphy was riding in the right front seat of her husband's automobile upon the occasion in question. In the collision she received injuries over her right eye, her chin, a laceration of her lip and bruise of her right shoulder; she also suffered abrasions to both knees and an acute sprain of her lumbar spine. She was seen by Dr. Bothwell Graham, III, a general practitioner in internal medicine of Columbia, six times; she incurred x-ray bills at the Columbia Hospital in the amount of $62 and Dr. Graham's bill for services was $60; she also was seen on March 9, 1965 by Dr. Holler, and at that time she still complained of trouble with her right knee. The ligaments appeared to be intact, but there was some lateral movement although not considered significant. Dr. Holler found a mass resulting from scar tissue on the outside and below the right knee; he testified that this area would be sensitive to being struck but would not impair the functioning of the knee; he also observed from the x-rays that Mrs. Murphy had most probably suffered a minor compression fracture of her 11th lumbar verte-

brae, which did not result in any limitation of activity or motion of back, and would probably not have any permanent adverse effect of any significance other than possible aggravation of a pre-existing arthritic condition, as shown on the x-rays. Dr. Holler's bill for services to Mrs. Murphy was $65. Mrs. Murphy was not hospitalized as a result of her injuries and she has continued to perform her usual household duties. Although she suffered from pain and discomfort her injuries were not 'of a serious or permanent nature. I find and conclude that she has suffered actual damages in the amount of $3,000.00.

### AS TO PLAINTIFF LINDA MURPHY:

Plaintiff Linda Murphy, 15 years old at the time of the accident, was riding in the front seat between her mother and father. In the collision she was thrown against the dash and received an acute sprain of her cervical spine, hematoma of left shoulder, contusion and abrasion of right posteria shoulder, and contusion and abrasion of left knee. She was seen about six times by Dr. Bothwell Graham, III, and was dismissed by him on March 29, 1963, as having been fully recovered. His bill for services was $75, and $37 for x-rays at the Columbia Hospital. She required no hospital confinement.

Linda was examined by Dr. Holler on March 9, 1965, for an evaluation for trial. At that time she was complaining of discomfort in her mid-back area. X-rays of her back demonstrated that she had developed 5 or 6 herniated lumbar discs medically termed "smorls nodes", which are herniations of the discs that protrude into the body of the vertebrae instead of outward. Dr. Holler stated that in his opinion this condition resulted from the trauma; that it would not require an operation, and that it would cause no pain from activity but that pain would more likely come from lack of physical activity. Thus, if she sits for long periods of time she would become a "squirmer"; the condition would also make her more susceptible to develop

osteoarthritis in these joints. Dr. Holler's bill for his examination and x-rays of the spine was $50.

Although Dr. James T. Green, the defendant's expert medical witness, did not examine Miss Murphy, at the trial he saw x-rays of her spine taken by Dr. Holler and confirmed that she had 4 or 5 smorls nodes in her lumbar spine; he strongly disagreed with Dr. Holler's assumption that this condition resulted from the trauma, and stated that in his many years of experience he had never seen a smorls node which he felt was secondary to trauma. He testified that this condition sometimes resulted from disease in young people, but generally he found the same developing in the older age groups. Again there was a sharp disagreement in the testimony of the medical experts.

The injuries to Linda Murphy caused her to suffer pain and anguish, she has developed 5 or 6 smorls nodes probably resulting from the trauma, which do not and will not require medical attention, will not be disabling, but will probably cause her to have some intermittant back pain from time to time, and will make that area of her back more susceptible to osteoarthritis. This past school year she was in the 11th grade in high school, and has been attending school regularly since the accident without any appreciable difficulty from her injuries. She was not hospitalized and was only treated by Dr. Graham about six times after the accident. I find and conclude that she has suffered actual damages in the amount of $5,500.00.

### AS TO PLAINTIFF DAVID MURPHY:

Plaintiff David Murphy, aged 10, was riding in the back seat of his father's car on the occasion of the accident. Dr. Graham, who examined him shortly afterwards, found that he had suffered no significant injury. Inasmuch as he had had a previous skull fracture the doctor made x-rays which were negative. His only complaint was a bruise to his left knee and his head.

Dr. Graham's bill for services was $20 and the cost of x-rays at the Columbia Hospital was $25. I find this plaintiff has suffered actual damages in the amount of $250.00.

### AS TO PLAINTIFF BILLY MURPHY:

Plaintiff Billy Murphy, who is 6 years of age, was also riding in the back seat of his father's automobile at the time of the accident; he suffered contusions of his shinbone, and upon examination by Dr. Graham there was evidence that he had had a slight nosebleed. Nothing else of significance was found by the doctor; his bill for services was $15. I find that this plaintiff has suffered actual damages in the amount of $200.00.

### AS TO PLAINTIFF ROY E. HICE:

Plaintiff Roy E. Hice was riding in the right rear seat of the Murphy automobile at the time of the collision. At that time he was 22 years of age and under the Mortuary Table, Section 26–12, as amended, supra, his life expectancy was 48.55 years. He is unmarried living with his parents in Tacoma, Washington, and is employed in his father's grocery store earning $150 per month. He went through the 8th grade in school, receiving a medical discharge from the Army for night blindness.

Prior to the accident he held several different jobs, one was that of a sheetrock hanger in Baltimore, Maryland, which required heavy lifting and climbing, and from which he earned $100 a week; he also worked as a filling station attendant in California, and as a car salesman while living with his parents in Germany.

In the collision both of his legs in the shin area were cut open to the bone, resulting in permanent scars to both legs; he also received an injury to his right knee, which Dr. Holler found to be a torn medial collateral ligament; he was also injured in his lower left rib cage

area. Immediately after the accident he was given firstaid treatment at the Fort Jackson Infirmary, and was then seen first by Dr. Holler on March 19, 1963. His injuries did not require any hospital confinement nor operative procedures. Dr. Holler saw this plaintiff three other times during March 1963; and apparently did not see him again until February 6 and March 8, 1965, for evaluation of his injuries prior to trial. At that time he found that Hice had developed a cartilage click which he had not had before; he was unable to extend his leg fully, and opined that this condition would be permanent provided it resulted from the cartilage tear; he further indicated that a healed ligament is not as good as one that has never been torn and would make Hice's knee susceptible to "giving way", as Hice claimed that it had done on 3 or 4 occasions since the accident. He further stated that in his opinion Hice should not do any stooping, heavy lifting or climbing ladders, and that his knee was more susceptible to further injury from a lateral blow.

This plaintiff was examined at the request of the defendants by Dr. James T. Green on February 8, 1965, who took several x-rays of his knee and chest during the examination. Here again there is a sharp divergence of opinion between Drs. Holler and Green as to the extent and permanency of the injuries received by Hice. Dr. Green found that there was no abnormality of the knee joint, that he had a full range of motion and could straighten his knee completely while lying prone on the examining table. He found no demonstrable instability of the knee, no evidence of crepitation, nor weakness of the ligaments, nor any perceptible osteoarthritis, and concluded that there was no indication for further treatment of the knee. Neither could Dr. Green make any objective findings in Hice's rib cage area despite his complaint of pain in the region of the 11th rib. Dr. Green testified that in his opinion there was no limitation on this plaintiff's ability to do any type of physical

work. Dr. Holler's bill for services rendered to Hice was $107.

This plaintiff was totally disabled for 6 to 8 weeks following the accident. He apparently remained in Columbia for several months thereafter attempting to find employment, but was unable to do so. He then went to San Francisco, but stated that he was unable to hold down his former job at the gas station because of his injuries; he thereafter moved to the State of Washington with his family, but was unable to find a job there. In early 1964 he went back to Baltimore, secured a job as a sheetrock worker and was only able to hold this job for about 3 weeks, having to give it up because he could not climb scaffolds, lift the heavy pieces of sheetrock, and his knee gave way on him at least 3 times. He had no earnings in 1963; earned approximately $300 from the sheetrock work, and then went back to the State of Washington in June 1964, where he has been working ever since in his father's grocery store.

 Based upon this plaintiff's work history prior and subsequent to the accident, his testimony upon the witness stand and the observations made of him by the court during the trial, it is obvious that he is somewhat unstable with limited education, has very little ambition, drive or determination. In view of the conflicting medical testimony as to the degree and permanency of his injuries, the court has mixed feelings as to its findings concerning this plaintiff. Without doubt he received some painful and disfiguring injury to his lower legs and was made to suffer considerable pain and discomfort; however, I feel that the plaintiff has failed to carry the burden of proof to establish to my satisfaction that he has suffered any substantial, permanent, partial disability which should to any appreciable extent interfere with his physical activity in earning a livelihood for himself.

I find that plaintiff Hice has suffered actual damages in the amount of $3,-500.00.

## AS TO INTERVENER-PLAIN-TIFF UNITED STATES OF AMERICA:

 I find that plaintiff Frison E. Murphy was furnished hospitalization and care by intervener-plaintiff United States of America, at its hospital at Fort Jackson Military Reservation, from the date of the accident, March 16, 1963, to September 3, 1963, less the 30 days from June 21 to July 21, 1963, while patient was on convalescent leave away from the hospital. Intervener contends that it is entitled to be reimbursed for 141 days hospitalization for a total of $5,120, based upon the fact that this plaintiff was furnished hospitalization during this period of time, and that this extended period of hospitalization was reasonably necessary considering the seriousness of said plaintiff's injuries. Plaintiff's position was supported by Dr. Holler who testified that Mr. Murphy's stay in excess of 5 months in the Government hospital was within reasonable limits. Dr. Green, the medical expert witness for the defendants, took sharp issue with this contention and testified that in his judgment based upon his experience with similar cases 40 days hospitalization should have been adequate. When Murphy returned to the hospital on July 21, 1963, his treatment consisted chiefly of a routine of physio-therapy which he probably would have received as an outpatient if he had been a patient at a nongovernment hospital. In view of the conflict of the expert medical testimony as to the amount of hospitalization reasonably necessary for Mr. Murphy, and the type of treatment he received after he returned to the hospital from convalescent leave on July 21, 1963, I find and conclude that intervener, United States of America, should not be paid for Murphy's hospitalization subsequent to June 21, 1963; that it is entitled to compensation for a period of 97 days from March 16, 1963 through June 21, 1963 [the date he was released from the hospital on convalescent leave] at $36 per day for a total of $3,492.00.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter of these actions.

2. The rights and duties of the parties are governed by the laws of the State of South Carolina, the place where the collision occurred.

3. Defendant, Tillie C. Smith, was guilty of actionable negligence by her failure to exercise due care in the operation of the 1962 Chevrolet automobile, as required by the common law rules of the road and the statutory laws of the State of South Carolina:

 a. By failing to maintain a proper lookout;

 b. By failing to yield the right-of-way to the 1957 automobile being driven by plaintiff Frison E. Murphy in violation of § 46–421 of the 1962 South Carolina Code of Laws, supra;

 c. By failing to stop at the stop sign erected on Lee Road at its intersection with Semmes Road as she approached and entered the said intersection while traveling in a southerly direction along said Lee Road, in violation of § 46–423 of the South Carolina Code of Laws. Pruitte v. Machen, et al., 215 S.C. 13, 53 S.E. 2d 866 [1949]; Branham v. Wolfe Transportation Co., 170 S.C. 164, 169 S.E. 889 [1932].

4. The negligence of the defendant Tillie C. Smith was imputed to her father, the defendant Thomas W. Smith, under the family purpose doctrine which is recognized in South Carolina. Davis v. Littlefield, 97 S.C. 171, 81 S.E. 487 [1913]; Mooney v. Gilreath, 124 S.C. 1, 117 S.E. 186 [1921]; Hewitt v. Fleming, et al., 172 S.C. 266, 173 S.E. 808 [1931].

5. The violation of Sections 46–421 and 46–423, supra, by defendant Tillie C. Smith in the operation of the automobile on said occasion constituted negligence *per se*. Field v. Gregory, 230 S. C. 39, 94 S.E.2d 15 [1956].

6. Plaintiff Frison E. Murphy was not guilty of any acts of negligence which concurred or contributed in any manner to the injuries and damages suffered by him and the other guest passengers in his automobile.

7. The negligence of the defendant, Tillie C. Smith, which was imputed and chargeable to the defendant, Thomas W. Smith, was the sole proximate cause of the collision and the resulting injuries and damages to the plaintiffs, without which they would not have occurred.

8. The defendant, Tillie C. Smith, in the operation of the automobile upon the occasion in question was not guilty of gross negligence, recklessness, wilfulness and wantonness so as to entitle plaintiffs to an award of punitive damages.

Based upon the foregoing findings of fact and conclusions of law it is ordered:

 a. That plaintiff Frison E. Murphy recover judgment against both defendants in the sum of Twenty-three Thousand, Four Hundred Twenty-five Dollars [$23,425.00] as actual damages.

 b. That plaintiff Mrs. F. E. Murphy recover judgment against both defendants in the sum of Three Thousand Dollars [$3,000.00].

 c. That plaintiff Linda Murphy recover judgment against both defendants in the sum of Five Thousand, Five Hundred Dollars [$5,500.00].

 d. That plaintiff David Murphy, by his guardian ad litem, Mrs. F. E. Murphy, recover judgment against both defendants in the sum of Two Hundred Fifty Dollars [$250.00] as actual damages.

 e. That plaintiff Billy Murphy, by his guardian ad litem, Mrs. F. E. Murphy, recover judgment against both defendants in the amount of Two Hundred Dollars [$200.00] as actual damages.

 f. That plaintiff Roy E. Hice recover judgment against both defendants in the sum of Three Thousand, Five Hundred Dollars [$3,500.00] actual damages.

 g. That intervener plaintiff United States of America recover judgment

against both defendants in the amount of Three Thousand, Four Hundred Ninety-two Dollars [$3,492.00] as actual damages.

It is further ordered that costs in each case be taxed against defendants.

Let judgments be entered accordingly.